# FILED

**December 13, 2016**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time 12:28 PM**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT CHATTANOOGA

| | | |
|---|---|---|
| SAMUEL STALLION, | ) | Docket No.: 2016-01-0471 |
| **Employee,** | ) | |
| v. | ) | |
| TRUGREEN, L.P., | ) | State File Number: 70707-2015 |
| **Employer,** | ) | |
| AND | ) | Judge Thomas Wyatt |
| NEW HAMPSHIRE INS. CO. | ) | |
| **CARRIER,** | | |

---

## EXPEDITED HEARING ORDER FOR MEDICAL AND TEMPORARY PARTIAL DISABILITY BENEFITS

---

This matter came before the undersigned Workers' Compensation Judge on December 1, 2016, for an in-person Expedited Hearing requested by Samuel Stallion pursuant to Tennessee Code Annotated section 50-6-239 (2016). Mr. Stallion sought medical and temporary disability benefits for back pain and right-leg weakness that allegedly occurred because of a February 25, 2016 work injury. The central issues presented at the Expedited Hearing were whether Mr. Stallion introduced sufficient expert medical opinion to establish he sustained a compensable injury and, if he did, whether he is entitled to temporary disability and additional medical benefits. For the following reasons, the Court determines Mr. Stallion is entitled to additional medical benefits and temporary partial disability benefits.[1]

### History of Claim

Mr. Stallion is a fifty-five-year-old resident of North Carolina who allegedly

---

[1] A complete listing of the technical record and the exhibits admitted into evidence is attached as an appendix to this Order.

1

injured his spine[2] on February 25, 2016, while attempting to lift a tailgate[3] on the lawn service truck his employer, TruGreen, L.P, assigned him to drive. (T.R. 1 at 1.) TruGreen initially accepted the compensability of the claim, authorizing care at Physician's Care, a walk-in facility.[4] (T.R. 15.)

Mr. Stallion received treatment at Physician's Care on nine occasions from March 1 through May 30. (Ex. 8 at 1, 5, 12, 14, 17, 19, 21, 25, 29.) Mr. Stallion gave a history of injury while lifting a heavy object at work and stated he had not previously experienced the low back pain with which he presented. *Id.* at 5. The Physician's Care providers diagnosed him with lumbago and sciatica in his lumbar spine and prescribed medication, physical therapy and an MRI. (Ex. 8.) Physician's Care never took Mr. Stallion completely off work, but, at the first visit, restricted him from bending over, climbing ladders, lifting or prolonged sitting. *Id.* at 1, 7, 12. The providers at Physician's Care gradually reduced Mr. Stallion's restrictions over time, although he stayed under a five-pound lifting restriction until May 23.[5] *Id.* at 14, 17, 20, 22, 28.

On May 10, Physician's Care referred Mr. Stallion for orthopedic care. (Ex. 8 at 23.) TruGreen's carrier offered Mr. Stallion an orthopedic panel from which he selected Dr. Jay Jolley. (Ex. 3; Ex. 10 at 1; Ex. 15.) Dr. Jolley's initial visit note of June 27 documented that Mr. Stallion gave a history of suffering injury when the tailgate of his work truck fell unexpectedly, causing him to instinctively try to catch it. Dr. Jolley further noted that Mr. Stallion spun to the left when he tried to catch the falling tailgate and, immediately afterward, noticed low back pain when he tried to lift the tailgate to close it. *Id.* at 2. He also recorded that Mr. Stallion told him he had not experienced back pain previous to the occurrence of the work injury. *Id.* Dr. Jolly reviewed the MRI of Mr. Stallion's lumbar spine and diagnosed him with "1. Low back pain. 2. Sprain. 3. Mild L3-4, L4-5 degenerative disc disease."[6] *Id.* at 3. He prescribed medication and

---

[2] Mr. Stallion also complained of right-knee pain, but the evidence admitted during the Expedited Hearing did not document treatment for a knee injury.

[3] Mr. Stallion alleged that the tailgate weighed 700 pounds. (T.R. 1 at 1; Ex. 5 at 1.) During cross-examination, he testified he did not know exactly how much the tailgate weighed, but stated that it felt like it weighed 700 pounds. TruGreen's local manager testified during the Expedited Hearing that the tailgate weighed 150 pounds and the truck in question was equipped with a mechanical device to help lower and raise the tailgate. Mr. Stallion testified the mechanical device on the truck was defective on the date of injury, requiring him to lift the entire weight of the tailgate himself.

[4] Mr. Stallion received treatment for his work injury through the emergency room at Parkridge East Medical Center on the date of injury. (Ex. 6 at 1.) Mr. Stallion testified he went to Parkridge because his supervisor at TruGreen told him to go for a drug test after he reported injuring his back at work.

[5] The note documenting the last visit at Physician's Care, which occurred May 30, did not address restrictions. (Ex. 8 at 29.)

[6] The MRI report indicates the radiologist found that Mr. Stallion had "[a] broad disc protrusion and moderate bilateral arthropathy result[ing] in mild canal and bilateral foraminal stenosis" at the L3-4 and L4-5 levels of his lumbar spine. (Ex. 7.)

placed Mr. Stallion on restrictions of no lifting in excess of twenty pounds. *Id.* at 4.

TruGreen submitted letters and forms to Dr. Jolley to obtain his causation opinion. In response to a causation letter, Dr. Jolley opined as follows to an inquiry whether Mr. Stallion's injury was "caused by his work injury by more than 51% as opposed to any other contributing factors or health conditions": "the ddd [degenerative disc disease] is not; yes to the sprain component." (Ex. 10 at 6.) In response to another question in the letter, Dr. Jolley indicated that sixty percent of Mr. Stallion's need for treatment related to the fact he sprained his back at work, while forty percent related to the degenerative disc disease in his lumbar spine. *Id.*

Dr. Jolley's next visit with Mr. Stallion on August 1 was his last. (Ex. 10 at 8.) In the note documenting this visit, Dr. Jolley opined that Mr. Stallion's degenerative disc disease was of sufficient severity "to cause pain" and might potentially require fusion surgery; he also stated "the degeneration isn't work related." *Id.* at 9. Dr. Jolley kept Mr. Stallion under the twenty-pound lifting restriction and noted "he will followup with [a] workman's compensation doctor in North Carolina." *Id.* Mr. Stallion testified he had not received any treatment for his alleged work injury since the August 1 visit with Dr. Jolley.

On August 9, Dr. Jolley issued an addendum to his August 1 report, noting "[t]his Addendum is prepared to replace information set out in the Office Note dated August 1, 2016[.]"[7] (Ex. 10 at 10.) In the addendum, Dr. Jolley stated Mr. Stallion was at maximum medical improvement and could return to regular duty. *Id.* Later, Dr. Jolley signed a September 26 inquiry letter sent him by TruGreen's attorney, checking a box that indicated Mr. Stallion does not require further treatment for his back sprain. (Ex. 12 at 1.)

As to Mr. Stallion's claim for temporary partial disability benefits, Physician's Care released Mr. Stallion to return to work under restrictions following the initial, March 1, visit. (Ex. 8 at 1.) Mr. Stallion testified during the Expedited Hearing that TruGreen rarely assigned him work within his restrictions, but instead assigned him to work his regular route. Mr. Stallion set forth in his affidavit, without rebuttal, that the performance of his route duties required him to get in and out of a truck multiple times per day; push, pull and carry a hose weighing forty to fifty pounds to spray lawns with chemicals; and exert significant effort with his hands and arms while holding the nozzle of the hose during the spraying process. (Ex. 5 at 1-2, 4.) He further testified that his regular work at TruGreen increased his pain, which, in turn, made him slower in completing his route. He also testified his pain medication made him lethargic to the point he did not complete his work and stated he missed both full and partial days from

---

[7] Dr. Jolley issued the addendum without seeing Mr. Stallion again. The parties did not introduce evidence as to who asked Dr. Jolley to provide the addendum.

work because of symptoms associated with his work injury.

Mr. Stallion testified that, on June 21, TruGreen's management put him on a leave of absence, citing a company policy limiting an employee's period of light duty work to ninety days.[8] (Ex. 5 at 4-5.) He stated the loss of income he suffered due to this lay-off resulted in his eviction from his home, thus necessitating that he relocate to his son's home in North Carolina to avoid living on the streets. Mr. Stallion testified he has not worked since his last day at TruGreen, although he contacted a TruGreen office in North Carolina in an unsuccessful attempt to obtain his old position in his new location.

Mr. Stallion filed a Petition for Benefit Determination on April 18. (T.R. 1 at 1.) When mediation did not resolve the parties' differences, the mediating specialist certified medical and temporary disability benefits issues to the Court for determination. (T.R. 2 at 1.) Mr. Stallion filed his Request for Expedited Hearing on September 28.

During the Expedited Hearing, Mr. Stallion asked for past and future temporary partial disability benefits and a panel from which to select a physician in North Carolina to treat his work injury. TruGreen contended that Mr. Stallion did not establish through expert medical opinion that his injury arose primarily out of and in the course and scope of employment. It also argued Mr. Stallion is not entitled to a treating physician in North Carolina because Dr. Jolley stated his work-related back sprain required no further treatment. Lastly, TruGreen argued that, if Mr. Stallion is entitled to temporary partial disability benefits, he is only entitled to payment of benefits through the date on which Dr. Jolley placed him at maximum medical improvement.

### Findings of Fact and Conclusions of Law

#### I.     Compensability

The Court first addresses whether Mr. Stallion established that he sustained an injury arising primarily out of and in the course and scope of his employment by TruGreen. The Court applies the following legal principles in addressing this and the other issues presented during the Expedited Hearing. Mr. Stallion bears the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). However, in order to obtain relief at the Expedited Hearing stage, he need not prove every element by a preponderance of the evidence. *McCord v. Advantage Human Resourcing,* No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015). Rather, he must come forward with sufficient evidence from which the Court can determine he is likely to

---

[8] Mr. Stallion testified he questioned why TruGreen placed him on a leave of absence for this reason because it rarely allowed him to work light duty during the period in question. TruGreen did not introduce evidence establishing what, if any, policy it had on the length it would provide an employee light duty work.

4

prevail at trial in establishing his injury is work-related and he is entitled to the relief he requests. *Id.*

The Court's causation decision begins with its analysis of whether Mr. Stallion proved he sustained a compensable injury under the definitions established by the Workers' Compensation Law. Tennessee Code Annotated section 50-6-102(14)(A) (2016) defines a compensable injury as one resulting from a "specific incident, or set of incidents, arising primarily out of and in the course and scope of employment." This provision also addresses the compensability of an aggravation of a preexisting condition, stating that workers' compensation coverage "shall not include the aggravation of a preexisting disease, condition or ailment unless it can be shown to a reasonable degree of medical certainty *that the aggravation arose primarily out of and in the course and scope of employment.*" (Emphasis added.)

Section 50-6-102(14)(B) expands on the above definitions by providing that an injury arises primarily out of and in the course and scope of employment only if the employee shows that the employment "contributed more than fifty percent in causing the injury, considering all causes." Mr. Stallion must establish the work-relatedness of his injury to a reasonable degree of medical certainty, meaning he must come forward with expert medical opinion establishing a causal link between the alleged injury and the employee's employment. *See* Tenn. Code Ann. § 50-6-102(14)(C) (2016). A medical expert must state his or her opinion on causation under a "more likely than not" standard, without resorting to speculation or mere possibility. *Id.* at § 50-6-102(14)(D).

Because Dr. Jolley diagnosed Mr. Stallion with a back sprain superimposed on preexisting lumbar degenerative disc disease, the Court decides this claim in view of section 50-6-102(14)(A), which provides workers' compensation benefits to an employee who establishes that an injurious incident at work aggravated an already-existing physical condition. The above-quoted terms of Section 50-6-102(14)(A) direct the Court's causation inquiry in aggravation of preexisting condition claims to whether the *aggravating event,* and not the underlying preexisting physical condition that was aggravated, arose primarily out of and in the course and scope of employment. This interpretation is implicit in the general assembly's use of the term "aggravation," which presupposes the condition itself predated the alleged injurious incident.

In analyzing the issue of whether the incident in which Mr. Stallion lifted the tailgate of TruGreen's truck entitles him to workers' compensation benefits, the Court finds instruction in three decisions of the Workers' Compensation Appeals Board that affirmed awards of medical benefits in aggravation of preexisting condition cases. In *Miller v. Lowe's Home Centers, Inc.,* No. 2015-05-0158, 2015 TN Wrk. Comp. App. Bd. LEXIS 40 (Tenn. Workers' Comp. App. Bd. Oct. 21, 2015), the employee fell at work injuring his hip. Radiological testing indicated that severe preexisting arthritic changes existed in the hip before the fall at work occurred. The employer denied hip replacement

5

surgery prescribed by the treating physician on the ground it was not liable for the preexisting arthritis in the hip.

The trial court found the employee's fall at work aggravated the arthritic condition in his hip and ordered the employer to pay for the prescribed surgery. The Appeals Board affirmed, holding,

> In the present case, it is undisputed that Employee had no prior difficulties with his left hip and no limitations in work activities due to his left hip before the August 31, 2014 work accident. It is undisputed that he suffered a work-related injury when he fell onto his left side, and it is also undisputed that he complained of radiating pain into his left hip following the fall. Most significantly, Dr. Wade testified that the work accident caused a "chronic exacerbation" of his preexisting hip condition. He further stated that the need for hip replacement surgery was "hastened" by the work accident. He concluded that Employee's pain following the work accident was the "primary indication for the surgery."

*Id.* at 13-14.

In *Sanker v. Nacarato Trucks, Inc.,* No. 2016-06-0101, 2016 TN Wrk. Comp. App. Bd. LEXIS 27 (Tenn. Workers' Comp. App. Bd. July 6, 2016), the employee suffered a compensable 2014 injury that was resolved through a settlement that guaranteed the employee future medical benefits. In September 2015, the employee sustained another work injury to the same part of the body, thus igniting a dispute as to whether his need for treatment following the latter injury related to the 2014 claim or a new 2015 injury. The parties presented competing expert medical opinions on the causation issue. The trial court chose to apply the opinion of a physician who opined the work-related aggravation in 2015 contributed to more than fifty percent of the employee's need for surgery. The Appeals Board upheld the trial court decision, holding,

> Thus, although the expert opinions concerning the precise apportionment of responsibility differed, their opinions were consistent that Employee suffered a work-related aggravation of his pre-existing condition and that this aggravation caused or contributed to the need for additional medical treatment, including surgery. It was within the trial judge's discretion to accept the apportionment testimony of the authorized treating physician over the opinion of Employer's medical expert.

*Id.* at *13.

In *White v. Boles Trucking*, No. 2016-04-0074, 2016 TN Wrk. Comp. App. Bd. LEXIS 86, at *7-8 (Tenn. Workers' Comp. App. Bd. Nov. 14, 2016), the Appeals Board

affirmed a trial court finding that an employer was liable for a fusion surgery to correct a preexisting spinal condition. Although the treating surgeon testified that radiological testing did not demonstrate that the preexisting condition was anatomically advanced by the work injury, the Appeals Board affirmed a finding the employee's condition was work-related when the employee "was previously asymptomatic and the February 11 accident 'increased the instability between L4 and L5, which [exacerbated] his symptoms.'" *Id.* at *8.

While the above opinions present different underlying fact scenarios, the Court notes the Appeals Board identified similar factual patterns in support of its affirmations of the awards of benefits below. The Appeals Board noted in each claim the employee there established that he or she sustained an actual injurious incident at work and that, before the work-related injurious incident occurred, the employee's preexisting condition was either asymptomatic, or sufficiently asymptomatic for a significant period of time before the work injury occurred, that the condition did not require treatment and did not impair the ability of the employee to perform his or her assigned duties.

In considering the evidence introduced during the Expedited Hearing in view of the statutory and case authority discussed above, the Court finds Mr. Stallion testified credibly and without rebuttal that he hurt his back on February 25 while lifting the tailgate of TruGreen's truck.[9] Furthermore, TruGreen came forward with no evidence rebutting Mr. Stallion's history of having not required medical treatment for back pain prior to the occurrence of the February 25 work injury.

The Wage Statement completed by TruGreen indicated Mr. Stallion earned weekly wages ranging from $400 to over $1,000 per week for forty-three of the fifty-two weeks preceding the alleged date of injury in performance of the strenuous work TruGreen assigned him. (Ex. 1.) The Court considers the Wage Statement documents that, prior to the February 25 work injury, Mr. Stallion was not impaired by back pain or any other reason from performing his work at TruGreen.

In view of the above-described evidence, the Court finds Mr. Stallion will likely prevail at trial in showing that he injured his back while lifting the tailgate of TruGreen's work truck on February 25. Furthermore, the Court finds Mr. Stallion will likely prevail at trial that the degenerative changes in his spine were not sufficiently symptomatic to impair his capacity to perform physically strenuous labor prior to the occurrence of his work injury.

Having determined that Mr. Stallion carried his burden of proving he sustained an injurious incident at TruGreen on February 25 that caused back-related pain and

---

[9] The Court notes that TruGreen's First Report of Injury (Ex. 2) and the histories recorded by Parkridge East Hospital, Physician's Care and Dr. Jolley (Ex. 6 at 1; Ex. 8 at 2; Ex. 10 at 2) all generally corroborate the mechanism of injury to which Mr. Stallion testified.

7

weakness that impaired his ability to work, the Court must next determine whether the expert medical evidence introduced during the Expedited Hearing established that his injury Mr. Stallion arose primarily out of and in the course and scope of employment. Again, the Court decides this issue under section 50-6-102(14)(A), which focuses on whether the work-related aggravating incident, and not the preexisting condition that was aggravated, is work-related.

Dr. Jolley diagnosed Mr. Stallion with low back pain caused by a "[s]prain" and "[m]ild L3-4, L4-5 degenerative disc disease." (Ex. 10 at 3.) His records indicate that the only history of injury he considered was Mr. Stallion's report that he did not suffer from back pain or right-leg weakness until he injured his back on February 25 while lifting the tailgate to TruGreen's work truck. *Id.* at 2. In response to an inquiry as to whether Mr. Stallion's complaints were "caused by his work injury by more than 51% as opposed to any other contributing factors or health conditions," Dr. Jolley opined, "the ddd is not; yes, to the sprain component." *Id.* In response to an inquiry whether Mr. Stallion's need for treatment related to his degenerative condition or his work injury, Dr. Jolley assessed sixty percent of the need for treatment to the work injury. *Id.*

In view of the above evidence, the Court finds that, at trial, Mr. Stallion will likely prevail in establishing that he suffered a compensable injury to his lumbar spine while lifting the tailgate of TruGreen's work truck on February 25. In support of this finding, the Court relies on the finding Mr. Stallion did not require treatment for back pain prior to February 25 and, more importantly, any symptoms he may have experienced in his back did not impair his ability to perform the strenuous work TruGreen assigned him during the year preceding the date of injury. The Court recognizes that, from an anatomical standpoint, Dr. Jolley opined the work injury did not cause the degenerative disc disease in Mr. Stallion's lumbar spine. However, Dr. Jolley also opined that Mr. Stallion's work injury did cause a lumbar sprain that accounted for more than fifty percent of his need for treatment of his spine when compared with the preexisting degenerative changes. Based on the above, the Court finds that, at this time, Mr. Stallion's work injury is compensable.

## II. *Medical Benefits*

### A. *Parkridge East Hospital Bills*

Mr. Stallion testified he told his supervisor at TruGreen on February 29 he had sustained a February 25 work injury and the supervisor told him to go for a drug test. Mr. Stallion testified he chose to go to Parkridge East Medical Center to comply with the supervisor's instructions.

The First Report of Injury completed by TruGreen indicated that Mr. Stallion gave notice of his injury on February 29 and the Parkridge East records indicate Mr. Stallion

8

presented for emergent treatment there on the same date. (T.R. 2; T.R. 6 at 1.) The Parkridge East treatment records indicated Mr. Stallion reported a work injury, but neither the treatment nor billing records establish that Mr. Stallion underwent a drug test at Parkridge East. *Id.* at 1, 8; Ex. 9 at 1-2.

On the basis of the above evidence, the Court finds that, at trial, Mr. Stallion will not likely prevail in establishing that TruGreen authorized his treatment at Parkridge East. Accordingly, the Court denies Mr. Stallion's request that TruGreen pay the Parkridge East bills.

### B. Ongoing Treatment in North Carolina

TruGreen contends Mr. Stallion failed to establish his entitlement to ongoing medical care because Dr. Jolley indicated in response to a written causation inquiry sent him after he released Mr. Stallion from his care that "Mr. Stallion does not need any further treatment for his back sprain injury. If any further medical treatment for Mr. Stallion's back is needed, this treatment would be for the degenerative disc disease which is not work related." (Ex. 12 at 1.)

The Court fails to find merit in TruGreen's argument that it is no longer responsible to provide authorized care of Mr. Stallion's work injury because Dr. Jolley said Mr. Stallion no longer needs treatment for the back sprain component of his injury. The *Miller, Sanker and White* opinions cited above held the employer was liable for the entirety of the treatment necessitated by the work-related aggravations of the preexisting treatments in those claims. In this claim, the evidence established that Mr. Stallion's preexisting spinal condition was sufficiently asymptomatic that he did not require treatment for it and it did not impair him from working at TruGreen for at least a year prior to the date of injury. Since his work injury occurred, Mr. Stallion has endured continuous back-related symptoms. He has undergone treatment for those symptoms and, due to those symptoms, the physicians authorized to treat him under workers' compensation placed restrictions on his work activities that led to the loss of his job at TruGreen.

The report Dr. Jolley generated following his last visit with Mr. Stallion recorded that Mr. Stallion reported intense back-related symptoms on that date. Nothing in the report indicated that Mr. Stallion's symptoms on that date differed from those symptoms he had reported throughout the course of his injury. Dr. Jolley did not note a difference in the nature or origin of the pain Mr. Stallion reported on the date of his last visit that would indicate Dr. Jolley's assessment that Mr. Jolley's back sprain had resolved resulted in a corresponding improvement in Mr. Stallion's back pain. In view of the above facts, the Court finds that Mr. Stallion will likely prevail at trial in establishing that the symptoms for which he seeks ongoing medical benefits relate to his work injury at TruGreen. Accordingly, the Court orders that TruGreen provide him a panel of

9

orthopedic surgeons or neurosurgeons in his locality in North Carolina from which he can select an authorized physician for ongoing care.[10]

### III. *Temporary Partial Disability Benefits*

Mr. Stallion seeks temporary partial disability benefits for the time he missed from work due to his injury. The Court finds TruGreen must pay those benefits.

In *Jones v. Crencor Leasing and Sales*, No. 2015-01-0332, 2015 TN Wrk. Comp. Bd. LEXIS 48, at *7-8 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015), the Workers' Compensation Appeals Board held, "[a]n injured worker is eligible for temporary disability benefits if: (1) the worker became disabled from working due to a compensable injury; (2) there is a causal connection between the injury and the inability to work; and (3) the worker established the duration of the period of disability." The Appeals Board in *Jones* further held that an employee may qualify for temporary partial disability benefits if the employer cannot accommodate the restrictions placed on the employee's activities due to the work injury or provide the restricted worker with earnings that equal or exceed the pre-injury average weekly wage during the period of temporary partial disability. *Id.* at *7-8.

Tennessee Code Annotated section 50-6-207(2)(B) (2015) defines how the compensation rate for temporary partial disability benefits is calculated. Per the above provision, the compensation rate paid for temporary partial disability benefits is "sixty-six and two-thirds percent (66 2/3%) of the difference between the average weekly wage of the worker at the time of the injury and the wage the worker is able to earn in the worker's partially disabled condition." *Id.*

The evidence established that Mr. Stallion sustained a compensable injury and the providers treating him at Physician's Care placed him under restrictions due to his compensable injury from March 1 until May 23. While the May 30 Physician's Care note—the one referring Mr. Stallion for orthopedic care—did not address restrictions, the Court finds Dr. Jolley's placement of a lifting restriction at Mr. Stallion's initial visit indicated Mr. Stallion was still impaired during the interim between the last visit at Physician's Care and the first visit with Dr. Jolley. Accordingly, the Court finds that, at trial, Mr. Stallion will likely prevail in establishing that Mr. Stallion's work injury restricted his activities from March 1 until August 9.[11]

---

[10] In his August 1 note, Dr. Jolley stated that Mr. Stallion "will followup with workman' compensation doctor in North Carolina." (Ex. 10 at 9.) He gave Mr. Stallion a note indicating he should seek out a fellowship-trained spine surgeon to consider fusion surgery. (Ex. 17.) The Court considers the above to constitute a referral pursuant to Tennessee Code Annotated section 50-6-204(a)(3)(A)(ii) (2016).

[11] The Court terminates Mr. Stallion's period of temporary partial disability benefits on August 9 because Dr. Jolley established August 9 as the date of maximum medical improvement. Tennessee Code Annotated section 50-6-207(2)(C) (2016) provides that an employee may not receive temporary partial disability benefits after the date he or

Mr. Stallion testified without rebuttal that he missed time from work between March 1 and August 9 due to the pain from his work injury and because the medicine prescribed for his work injury made him lethargic. He further testified that he has not worked anywhere since TruGreen placed him on leave of absence. In view of the above facts and because Mr. Stallion was restricted due to his work injury, the Court finds that, at trial, Mr. Stallion will likely prevail in establishing his entitlement to temporary partial disability benefits from March 1 and August 9.[12]

The Wage Statement filed by TruGreen documents that Mr. Stallion's average weekly wage during the fifty-two weeks preceding the date of injury was $573.32. (Ex. 1.) The payroll records documenting the wages Mr. Stallion earned at TruGreen after the date of injury indicate Mr. Stallion earned less than his average weekly wage for most of the weeks he worked until TruGreen placed him on leave of absence. By the Court's calculation, Mr. Stallion is entitled to the following amounts of temporary partial disability for the following time periods, totaling $4,567.54:

| Week Ending | Amount Paid | TPD Due |
| --- | --- | --- |
| March 5, 2016 | $174.00 | $266.22 |
| March 12, 2016 | $0 | $382.22 |
| March 19, 2016 | $198.00 | $250.22 |
| March 26, 2016 | $258.00 | $210.22 |
| April 2, 2016 | $274.56 | $199.18 |
| April 9, 2016 | $536.64 | $24.46 |
| April 16, 2016 | $287.04 | $190.86 |
| April 23, 2016 | $564.72 | $5.74 |
| May 7, 2016 | $555.36 | $11.98 |
| May 28, 2016 | $446.16 | $84.78 |
| June 4, 2016 | $542.88 | $20.30 |
| June 11, 2016 | $0 | $382.22 |
| June 18, 2016 | $499.20 | $49.42 |
| June 25, 2016 | $24.96 | $365.58 |
| July 2, 2016 | $0 | $382.22 |
| July 9, 2016 | $499.45 | $49.24 |
| July 16, 2016 | $0 | $382.22 |
| July 23, 2016 | $0 | $382.22 |
| July 30, 2016 | $0 | $382.22 |
| August 6, 2016 | $0 | $382.22 |

she attains maximum medical improvement.

[12] Mr. Stallion's claim he is entitled to temporary partial disability benefits after August 9 is without merit because Dr. Jolley placed him at maximum medical improvement on that date.

August 9, 2016        $0                $163.80


**IT IS, THEREFORE, ORDERED** as follows:

1. TruGreen and/or its carrier shall promptly proffer Mr. Stallion a panel of orthopedic surgeons or neurosurgeons in Mr. Stallion's locality in North Carolina from which Mr. Stallion shall select a physician to provide ongoing care of his compensable injury. TruGreen and/or its carrier shall promptly schedule Mr. Stallion an appointment for treatment with the selected physician.

2. TruGreen and/or its carrier shall pay Mr. Stallion $4,567.54 in past-due temporary disability benefits.

3. Mr. Stallion's claim for temporary partial disability benefits after August 9, 2016, is denied.

4. Mr. Stallion's claim for payment of the bills he incurred at Parkridge East Medical Center is denied.

5. **This matter is set for a telephonic Status Hearing on March 15, 2017, at 10:00 a.m. Eastern Time.**

6. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2016). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

7. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit by email at WCCompliance.Program@tn.gov or by telephone at (615) 253-1471 or (615) 532-1309.

**ENTERED this the 13th day of December, 2016.**


_____
**Judge Thomas Wyatt**
**Court of Workers' Compensation Claims**

12

Status Hearing:

A Status Hearing has been set with **Judge Thomas Wyatt, Court of Workers' Compensation Claims. You must call toll-free at 855-747-1721 or 615-741-3061 to participate in the Status Hearing.**

**Please Note: You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation.**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk within seven business days of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a filing fee in the amount of $75.00. Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the

Court Clerk within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within five business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if any, with the Court Clerk within five business days of the filing of the appellant's position statement. All position statements pertaining to an appeal of an interlocutory order should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

## APPENDIX

Exhibits:

1. Wage Statement;
2. First Report of Injury;
3. Agreement Between Employer/Employee Choice of Physician Form;
4. Payroll records;
5. Affidavit of Samuel Stallion;
6. Medical records of Parkridge East Hospital;
7. Medical records of Tennessee Imaging and Vein Center;
8. Medical records of Physician's Care, P. C.;
9. Medical bills;
10. Medical records of Southeastern Spine/Dr. Jay Jolley;
11. Final Medical Report of Dr. Jay Jolley;
12. Opinion Letter of Dr. Jay Jolley;
13. Utilization Review documentation—Benchmark Physical Therapy;
14. Peer Review documentation—Benchmark Physical Therapy;
15. June 14, 2016 letter from Attorney Charles Poss to Samuel Stallion;
16. Documentation of restrictions imposed by Dr. Jay Jolley;
17. Handwritten note from Dr. Jay Jolley to Samuel Stallion;
18. Medical Examiner's Certificate regarding qualification to drive a commercial vehicle (sustained objection—relevance);
19. Off-Work slip from Parkridge East Hospital;

14

20. Paycheck stubs; and
21. TruGreen human resources records (sustained objection—hearsay).

Technical record:[13]

1. Petition for Benefit Determination;
2. Dispute Certification Notice;
3. Request for Expedited Hearing;
4. Notice of Expedited Hearing;
5. Employee's Position Statement; and
6. Employer Trial Brief.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 13th day of December, 2016.

| Name | Via Email | Service sent to: |
|------|-----------|------------------|
| Samuel Stallion, Self-Represented Litigant | X | sstallion@live.com |
| Charles Poss, Attorney | X | charlie.poss@leitnerfirm.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims

---

[13] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.